United States District Court
Southern District of Texas
**ENTERED**
August 08, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, § § Plaintiff-Respondent, § § § VS. § § § § NATHANIEL GORDON, III, § § Defendant-Movant. § | CRIMINAL ACTION NO. H-11-165-5 CIVIL ACTION NO. H-15-1481 |

**MEMORANDUM AND OPINION GRANTING MOTION TO
DENY § 2255 MOTION AND TO DISMISS CASE**

This motion arises from a large-scale and prolonged mortgage-loan fraud criminal prosecution. Nathaniel Gordon pleaded guilty to conspiracy to commit mail, wire, and bank fraud, and conspiracy to commit money laundering in connection with the mortgage-loan fraud scheme, in violation of 18 U.S.C. §§ 1341, 1343, 1344, and 1349 (count one), and § 1956(h) (count two). His plea agreement, entered under Rule 11(c)(1)(B), included a waiver of his rights to appeal and to file collateral challenges. After a detailed and lengthy colloquy, the court found that Gordon's plea was knowingly and voluntarily made and accepted the plea.

The Sentencing Guidelines range that resulted was 63 to 78 months. That included an offense level based on holding Gordon accountable for a fraud loss of $1,656,810.00. He was deemed an average participant in an extensive scheme that had at least four victims and at least five participants. Gordon was a loan officer with the Gordon Financial Group and a real estate agent. His offense level included an enhancement for abusing his position of trust as a loan officer.

Although the fraud loss resulted from 10 transactions, fewer than some of the other defendants had engaged in, the loss amounts were significant. The court did not impose a fine but ordered Gordon to pay a total of $1,656,810 in restitution, jointly and severally with other defendants.

The government moved for a below-Guideline sentence based on Gordon's substantial assistance and recommended a 42-month sentence. After allocution, the court sentenced Gordon under § 3353(a) to serve 24 months in custody. Gordon did not appeal. Instead, one day before the deadline for filing a notice of appeal, he filed an unrepresented "Motion to Reconsider Sentence." (Docket Entry No. 377). Two days later, his trial counsel, Lonnie Knowles, moved to withdraw, stating that Gordon had released him as counsel and that a new lawyer had entered an appearance for Gordon. The court granted the motion to withdraw but denied the motion to reconsider.

In his § 2255 motion, Gordon alleges that Knowles provided ineffective assistance at sentencing and in failing to appeal. The record clearly shows that Knowles provided constitutionally effective assistance, and Gordon has failed to show otherwise. The record also clearly shows that Gordon's plea was voluntary and informed and that his waiver of his appellate and collateral-challenge rights is enforceable. His § 2255 motion fails as a matter of law. The government's motion to dismiss Civil Action No. 15-1481 is granted, and Gordon's § 2255 motion in Criminal Action No. 11-165 is denied. The reasons for these rulings are explained below.

I.  **Background**

In his plea agreement, Gordon agreed to the following factual basis, which described his involvement in the mortgage-loan fraud scheme:

> 17.     Defendant is pleading guilty because he is guilty of the charges contained in Counts One and Two of the Superseding Indictment. If this case were to proceed to trial, the United States could prove each element of the offenses beyond a reasonable

doubt. The following facts, among others would be offered to establish the defendant's guilt:

The defendant, Nathaniel GORDON III (hereinafter GORDON), participated in the mortgage fraud scheme alleged in Count One of the indictment as a loan officer, as well as a borrower and seller. He worked in the lending industry as a loan officer in Gordon Financial Group and as a relator at Taurus Realty. GORDON utilized his contacts within the lending industry to obtain mortgage loans by fraud.

Residential mortgage loans were applied for using material false information and misrepresentations regarding the borrower's creditworthiness. The deceptions regarding borrower creditworthiness included but were not limited to employment, income, cash on deposit, and indebtedness. The debt to income ratio was manipulated to make the borrower's loan application fit within the lending guidelines of the lender. Typically the income was inflated and/or the borrower's indebtedness was not disclosed. GORDON knew of the false nature of the information provided in the loan submissions and knew and had reason to believe it would be material to the Lenders' decisions to fund the mortgage loans.

Individuals with good credit were recruited to act as borrowers in these transactions. The borrowers were recruited as real estate investors whose only investment in the transaction would be their good credit. Frequently, the loans were submitted with the false representation that the purchase was for the borrower's primary residence so that 100% financing could be obtained. Funds needed to close the transaction, including earnest money and buyer closing costs, were paid by one of the conspirators in a fashion which made it appear that the source of funds was the borrower. The borrowers were paid with proceeds from the fraud for their participation in the acquisition of the property.

The fraudulent loan applications and supporting documents were furnished to the lenders by United States mail or interstate commercial carrier (hereinafter mail) and through electronic transfers such as E-mail and facsimiles. The false information and misrepresentations were material to the lenders' decision to fund the residential loans and under what conditions they would fund the loans. Loan transaction documents were also electronically transferred or mailed to the lenders by the title companies. To fund the loans, lenders would wire transfer the loan funds to the title company's escrow. Fed Wire has confirmed that these wire transfers crossed state lines at least once when the wire moved through the Federal Reserve Bank in New York, was settled through Fed Wire in new Jersey, and then sent to the escrow accounts of the title companies in Texas. Some of the fraudulently obtained mortgage loans were obtained by the conspirators from lending institutions which were insured by the Federal Deposit Insurance Corporation (FDIC) including Bank of Oklahoma, JP Morgan Chase Bank, Wells Fargo Bank, Patriot Bank, IndyMac Bank and Flagstar

Bank. The majority of the loans obtained during the fraudulent scheme fell into default and the properties were foreclosed.

GORDON established and used the assumed name entities Webber and Associates as well as Camden Enterprises in the execution of the scheme. GORDON's co-conspirators also established assumed name business entities with corresponding bank accounts which were used during the execution of the scheme including J&C Management Investments, CC San Enterprises, Panacea Properties, Wentworth Management, and Chulo Construction.

The fraudulent property transactions were structured so that loan proceeds could be extracted for the benefit of the conspirators and ultimately deposited into one or more of the assumed name bank accounts. These fraudulently obtained funds were used to fund future fraudulent property transactions, including earnest money payments and/or closing costs, as well as pay outs to conspirators. When a conspirator paid a borrower's closing cost or earnest money, lenders were led to believe the source of those funds was the borrower. The payments of these expenses by a borrower is a factor considered by lenders in evaluating the incentive of borrowers to repay loans.

GORDON purchased several properties by means of false statements as identified in the table below: [*See* D.E. 123 p. 12 for table detailing three properties in Houston, TX]. GORDON falsely claimed to be purchasing each of these properties as his primary residence. These were material false statements since it affected the amount each lender was willing to lend to GORDON and at what interest rate.

. . .

GORDON also arranged for one of his business associates, Will Gamer, to sell several properties through this scheme to defraud. The funds obtained from the fraud were transferred in a manner to hide and conceal the true source of the funds. Gamer was building homes in the Houston, Texas area which he wanted to sell at a premium. Straw borrowers were recruited to purchase the properties in their names. Seller proceeds were collected by Gamer through his Company W. Gamer Enterprises. From the W. Gamer Enterprises account Gamer sent funds to various participants in the scheme including to GORDON who deposited the funds into his Camden Enterprises account as identified below: [table omitted].

(Docket Entry No. 123, pp. 9-16).

The PSR described Gordon's role and relevant conduct in great detail. (Docket Entry No. 287, ¶¶ 7-70).

4

Relevant Conduct Assessment

72. The offense involved the coordination of several persons working in various capacities (i.e. loan officers, mortgage broker, recruiters, and real estate agents) to further the criminal objectives. Nathaniel Gordon, III, worked in the lending industry as a loan officer at Gordon Financial Group and in real estate as an agent for Taurus Realty. Gordon utilized his relationship with a local builder, Willie Gamer, to purchase homes at inflated values and to obtain kickbacks from the builder disguised as real estate commissions or other business related fees owed by the builder. Gordon participated in fraudulent loan transactions utilizing his licenses as a real estate agent and loan officer. Gordon established and used assumed name entities and bank accounts for the purpose of executing the mortgage fraud scheme (Camden Enterprises, Webber & Associates). The property transactions were structured so that the fraudulently obtained loan proceeds could be extracted for the benefit of the conspirators and ultimately deposited into one or more of the assumed name bank accounts. These fraudulently obtained funds were used, in part, to fund future fraudulent property transactions. The manner in which these funds were handled concealed the true source and nature of the funds from the lender and it was made to appear the funds were funds the borrower had on hand. By way of this exception and concealment of the fraudulent conduct, the offense is considered complex and intricate in nature, and warrants an enhancement for sophisticated means. Gordon was convicted of mail wire and bank fraud (conspiracy) which has a 30-year statutory maximum penalty, and, money laundering (promotion and concealment). As indicated in the chart above, Gordon is held accountable for a total loss of $1,656,810.00 (See attached Chart I for specific properties). Gordon participated in only 10 of the 91 fraudulent mortgage transactions, however, the loss he is held to is significant in comparison to the number of properties attributed to the codefendants. Gordon is considered an average participant in the scheme which defrauded at least four victim lenders and involved at least five criminal participants. As a loan officer, Gordon abused his position of trust with the banks, as the false information and misrepresentations Gordon made were material to the lender's decision to . . . fund the residential loans and under what conditions. There is no evidence that the defendant derived more than $1,000,000 in gross receipts from the victim lenders.

(*Id.*, ¶ 72).

At the rearraignment, Gordon made the following statements under oath in response to the court's questions and admonishments:

| | |
|---|---|
| THE COURT: | You understand that today, when you are talking about – when you're deciding here in court, under oath, whether to plead guilty and whether to agree to enter this plea agreement, |

5

>you don't know for sure what sentence you're going to get?

. . .

DEFENDANT GORDON: Yes, your Honor.

THE COURT: Before we know that, there has to be a presentence investigation, an interview of each of you; there has to be a report prepared and an analyses conducted of how the sentencing guidelines apply to the facts here and to you. And then I have to make a decision on whether the case should be sentenced within the guidelines or above it or below it and exactly how much time you ought to get. None of that work has been done yet. Do you understand?

. . .

DEFENDANT GORDON: (Indicating).

THE COURT: And in this case, there's the added uncertainty of the government offering to consider carefully your cooperation and delay sentencing until you have an opportunity to cooperate. You understand that?

. . .

DEFENDANT GORDON: Yes, your Honor.

THE COURT: But you don't know for sure if you're going to be able to provide sufficient substantial assistance – or substantial enough assistance, in the government's eyes, to have that result in a lower sentence. You understand that?

. . .

DEFENDANT GORDON: Yes, your Honor.

THE COURT: Bottom line is that if the sentence you end up getting is heavier than you expect, you can't get out of your plea on that basis. You understand that you are stuck with it?

. . .

> DEFENDANT GORDON: (No audible response).
>
> THE COURT: And under the terms of this plea agreement you are really stuck because you are giving up your right to appeal from the sentence or the way in which it's calculated on any ground except that it's higher than the statute allows So, that means I would have to sentence you, bottom line – on Count 1 for more than 30 years, Count 2 for more than 20 years before you could have an appeal – or impose a fine amount that was above what the statute permitted. And we've told you what the statute permits. Do you understand?
>
> . . .
>
> DEFENDANT GORDON: Yes, your Honor.
>
> THE COURT: And you're giving up, under this plea agreement, the right to file a later challenge – after the appeals are done and the judgment is final, to file a challenge after that to either the conviction or the sentence on any ground. Do you understand that?
>
> . . .
>
> DEFENDANT GORDON: Yes, your Honor.
>
> THE COURT: So, the bottom line is that, in practical terms, you really have no way to challenge whatever sentence I give you as long as I stay within the statutory maximus. You understand?
>
> . . .
>
> DEFENDANT GORDON: Yes, your Honor.

(Docket Entry No. 512, pp. 20-22).

At the June 3, 2014 sentencing, Knowles again appeared on Gordon's behalf. No party objected to the presentence report. The government presented its U.S.S.G. § 5K1.1 motion and asked for a 42-month sentence, a significant reduction from the Guideline low point of 63 months. After hearing from Gordon and Knowles, the court entered the following findings under § 3553(a):

> [G]iven the role that Mr. Gordon played, given the level of his responsibility, given the amount of the fraud loss, on the one hand, but also given his cooperation, his restitution, and the other factors of who he is, and the 3553(a) framework, that the best number I can come up with, and I must, is 24 months. I do believe that that accommodates the guideline objectives, and at the same time takes into account appropriately the 3553(a) factors, and it is this Court's judgment.
>
> MR. KNOWLES: Thank you, Your Honor.

(Docket Entry No. 510, pp. 16-17).

At the end of the sentencing hearing, the court admonished Gordon about his appellate rights:

> I don't believe there is any appellate right that survives the plea agreement. If you believe differently, you must file a notice of intent to appeal within 14 days from the date the judgment is entered. If you want a lawyer to represent you, you may ask the Court to appoint one. Do you understand?

(*Id.*, p. 20). Gordon stated, under oath, in his counsel's presence, that he understood. The court entered final judgment on June 5, 2014.

On June 18, 2014, 13 days later, Gordon filed a *pro se* "Motion to Reconsider Sentence." It stated:

> Mr. Lonnie Knowles no longer represents me, I Nathaniel Gordon III am representing myself pro se.
>
> Motion to reconsider on the grounds that my lawyer, Lonnie Knowles didn't serve me well. He did not uphold his duties to me as discussed prior to sentencing; as we discussed he was going to ask for home confinement based on:
>
> A sentencing to include home confinement would be in line with the way Mr. Jose Miguel Batista was sentenced. The fact that I have paid more in restitution than any other participant and that my loss amount was less than that of Mr. Batista, it would be fair that I was sentenced similarly to Mr. Jose Miguel Batista.
>
> Home confinement would have allowed me to keep my job and continue making said restitution payments.
>
> Attorney Lonnie Knowles blindsighted me by recommending 24 months because our many discussions always centered around the best way to keep me out of jail and to

> ask for home confinement. His sentencing memorandum was written with the recommendation for home confinement, and he did not stick to that when in the courtroom.
>
> Furthermore, his sentencing memorandum was not written specifically for me; as much of it was cut-and-paste from someone else's sentencing memorandum, which is why there were errors about me and my background included in it, such as any time spent in the military.
>
> While I realize a sentence of purely home confinement may not have been granted, he should have at least aimed for that as discussed and then proposed a sentence similar to Mr. Batista, as discussed.
>
> With my duty to repay the victims and my current family situation (two young children and a third on the way) I am a much more productive citizen if allowed to spend most if not all of my sentence on home confinement.

(Docket Entry No. 377).

The government's response pointed out that:

> [b]ased upon the arguments of Gordon's counsel, Lonnie Knowles, and after reviewing the Sentencing Memorandum he filed on behalf of Gordon, the court concluded a variance from the applicable guideline range of level 26 [63 to 78 months] was warranted. In [assessing] the sentence the court departed/varied downward by 39 months (3 1/4 years) from the minimum sentence under the Sentencing Guidelines sentencing Gordon to only 24 months for each of counts one and two.

(Docket Entry No. 385, p. 2). The government pointed out that "[f]or purposes of 3582(c)(1)(B), Rule 35 of the Federal Rule of Criminal Procedure only permits the court to correct sentences within fourteen days of sentencing that resulted from "arithmetical, technical, or other clear error," and is clearly inapplicable." (*Id.*, pp. 3-4).

The government concluded:

> Gordon's dissatisfaction with his lawyer is misplaced. The Sentencing Memorandum filed by counsel was extensive and did not ask the court to impose home confinement. It was not until the Court signaled during the sentencing hearing that home confinement was too large a variance form the Guidelines that counsel took the

> appropriate strategic step of asking for a substantial variance that the Court was more likely to accept. While not palatable to a disappointed client, counsel's recommendation during sentencing was in Gordon's best interest. Armed with the knowledge the court was not inclined to impose home confinement in Gordon's case, counsel influenced the court to impose a substantially lower sentence than recommended by the government.

(*Id.*, pp. 5-6). The court denied Gordon's motion. (Docket Entry No. 389).

A few days later, Knowles filed a motion to withdraw as Gordon's counsel, stating that he was "unable to effectively communicate with Defendant so as to be able to adequately represent Defendant"; that "Defendant has released Movant from any future responsibility in this cause"; that "Defendant had filed his "pro se" Motion to Reconsider Sentencing"; and that another attorney had entered an appearance on Gordon's behalf and filed "Defendant, Nathaniel Gordon, III's Motion to Extend Voluntary Surrender Date." (Docket Entry No. 381). The court granted Counsel's Motion to Withdraw on July 1, 2014. (Docket Entry No. 388).

Gordon has been in custody since September 2014. In June 2015, he filed this § 2255 motion, alleging ineffective assistance in the plea, sentencing, and failure to appeal.

## II. The Allegations and Governing Law

### A. Gordon's Ineffective Assistance Claims

Gordon alleges the following grounds in his § 2255 motion:

"Ground One: Ineffective assistance of counsel. Defense counsel failed to file an appeal when I requested that several issues about my case be reviewed."

"Ground Two: Ineffective assistance of counsel. Defense counsel failed to dispute and challenge the "actual loss" amount of restitution that is contributed to me."

"Ground Three: Violation of constitutional Rights. Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea."

10

"Ground Four: Ineffective assistance of counsel. Defense counsel failed to explain the appeal process to me."

(Docket Entry No. 500, pp. 4-8). The court ordered Knowles to file an affidavit addressing the alleged failures to "explain the appeal process to the defendant" and to "file an appeal when the defendant requested that several issues about his case be reviewed." (Docket Entry No. 514, p. 2; Docket Entry No. 515, pp. 1-2). Knowles filed the requested affidavit. (Docket Entry No. 518).

B.  The Applicable Legal Standards

28 U.S.C. § 2255 provides in relevant part that:

> [a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"Section 2255 provides the primary means of collateral attack on a federal sentence. Relief under this section is warranted for any error that occurred at or prior to sentencing." *Cox v. Warden, Fed. Detention Ctr.*, 911 F.2d 1111, 1113 (5th Cir. 1990) (internal quotations and citations omitted). A § 2255 motion does not require an evidentiary hearing if the motion and the record conclusively show that the prisoner is not entitled to relief. *United States v. Bartholomew*, 974 F.2d 39, 41 (5th Cir. 1992).

To obtain collateral relief under 28 U.S.C. § 2255, a defendant "must clear a significantly higher hurdle" than the standard that would exist on direct appeal. *United States v. Frady*, 456 U.S. 152, 166 (1982). "Following a conviction and exhaustion or waiver of the right to direct appeal, [courts] presume a defendant stands fairly and finally convicted." *United States v. Cervantes*, 132

F.3d 1106, 1109 (5th Cir. 1998). "As a result, review of convictions under [§] 2255 ordinarily is limited to questions of constitutional or jurisdictional magnitude, which may not be raised for the first time on collateral review without a showing of cause and prejudice." *Id.; see also Massaro v. United States,* 538 U.S. 500, 504 (2003); *Frady,* 456 U.S. at 166; *United States v. Lopez,* 248 F.3d 427, 433 (5th Cir. 2001); *United States v. Kallestad,* 236 F.3d 225, 227 (5th Cir. 2000).

Gordon is representing himself. Uncounseled pleadings are reviewed under a less stringent standard than those drafted by attorneys and are entitled to a liberal construction that includes all reasonable inferences that can be drawn from them. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007); *Haines v. Kerner,* 404 U.S. 519 (1972). At the same time, however, unrepresented litigants are required to provide sufficient facts to support their claims. *United States v. Pineda,* 988 F.2d 22, 23 (5th Cir. 1993). Even under the rule of liberal construction, "mere conclusory allegations on a critical issue are insufficient to raise a constitutional issue." *Id.* (citing *United States v. Woods,* 870 F.2d 285, 288 n.3 (5th Cir. 1989)); *see also Ross v. Estelle,* 694 F.2d 1008, 1011 (5th Cir. 1983) ("Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his *pro se* petition . . . to be of probative evidentiary value.").

### III. Analysis

#### A. The Alleged Failure to Appeal (Grounds One and Four)

Counsel's failure to file a requested appeal is ineffective assistance without a showing that the appeal would have merit. *Roe v. Flores-Ortega,* 528 U.S. 470, 480-86; *United States v. Tapp,* 491 F.3d 263 (5th Cir. 2007). Counsel must consult with the defendant about appeal when there is reason to think that a rational defendant would want to appeal, or that this defendant reasonably demonstrated his interest in appealing. *Roe,* 528 U.S. at 480. If, as here, the defendant pleaded

guilty, that may indicate the defendant's interest to end judicial proceedings and severely limit any appealable issues.

If the record supports the claim that Gordon told Knowles to appeal, Gordon would be entitled to do so out-of-time despite his waiver of appellate and collateral-challenge rights or an inability to identify meritorious grounds that might survive the waiver. *See Tapp*, 491 F.3d at 266. Gordon's § 2255 motion alleges that "Defense counsel failed to file an appeal when [the defendant] requested that several issues about his case be reviewed," and "Defense counsel failed to explain the appeal process to [the defendant]." (Docket Entry No. 500, pp. 4, 8). Knowles's affidavit states:

> Immediately following the June 3, 2014 sentencing I was "fired" and requested by Mr. Gordon (and his family) to cease and desist any further efforts on his behalf. I had no further direct contact with Mr. Gordon, I did not advise him post-sentencing of any rights to appeal.
>
> Within several days after June 3, 2014 I was contacted by two attorneys that had apparently consulted with Mr. Gordon regarding an appeal of his sentence. Attorney Leticia Quinones and Randy Schaeffer both spoke with me concerning Mr. Gordon's circumstances. I am not sure what, if anything, they may have shared with him concerning any appeal rights.
>
> On June 14, 2014, I filed a Motion to Withdraw. An Order granting my Motion to Withdraw was granted on July 1, 2014.

(Docket Entry No. 518, p. 1).

Knowles's affidavit is consistent with Gordon's motion to reconsider his sentence that he filed on June 17, 2015, two days before the deadline to appeal. (Docket Entry No. 377). Gordon stated Knowles no longer represented him. Gordon alleged that Knowles had disregarded instructions about the sentencing hearing but said nothing about an appeal. Gordon's motion was focused on being resentenced to home confinement. (*Id.*).

The record shows no basis to infer that a rational defendant in Gordon's position would have

wanted to appeal, or that Gordon reasonably showed Knowles that he wanted to do so. *See Flores-Ortega*, 528 U.S. at 480. The record fails to demonstrate by a preponderance of the evidence that Gordon asked Knowles to file an appeal after sentencing. To the contrary, shortly after the June 3, 2014 sentencing, Gordon and his family told Knowles that he no longer represented Gordon and to end further efforts on his behalf.

Gordon's conclusory allegation that he "requested that several issues about his case be reviewed" is insufficient in the face of the significant downward variance he obtained from the court, below the variance the government recommended; and Gordon's own filings, including his motion to reconsider, which corroborates Knowles's affidavit. The record fails to show a reasonable probability that, but for counsel's alleged failure, Gordon would have timely appealed.

There is no basis to either hold a hearing or grant relief on Gordon's first and fourth claims.

### B. The Waiver and Alleged Ineffective Assistance at the Rearraignment and Sentencing (Grounds Two and Three)

A defendant may waive his right to appellate review and to postconviction relief if the waiver was knowing and voluntary. *See United States v. White*, 307 F.3d 336, 341 (5th Cir. 2002) (citing *United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir. 1994); *see also United States v. Hernandez*, 234 F.3d 252, 254 (5th Cir. 2000)). The defendant must know that he had a right to seek appellate and collateral review and that he was giving up that right. *See United States v. Portillo*, 18 F.3d 290, 292 (5th Cir. 1994) (discussing waiver of appellate rights). A claim of ineffective assistance of counsel may survive a waiver "when the claimed assistance directly affected the validity of that waiver or the plea itself." *White*, 307 F.3d at 343. As long as the plea and the waiver themselves were knowing and voluntary and the contested issue is the proper subject of a waiver, "the guilty plea

sustains the conviction and sentence and the waiver can be enforced." *White,* 307 F.3d at 343–44.

Ineffective-assistance-of-counsel claims can provide a basis to invalidate a waiver. The standard for judging the performance of counsel requires the petitioner to prove both deficient performance and resulting prejudice. *Strickland v. Washington,* 466 U.S. 668, 697 (1984). Deficient performance is established by "show[ing] that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see also United States v. Kimler,* 167 F.3d 889, 893 (5th Cir. 1999). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

Federal habeas review of counsel's performance "must be highly deferential" and the reviewing court must "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." *Moore v. Johnson,* 194 F.3d 586, 591 (5th Cir. 1999) (citing *Strickland,* 466 U.S. at 689). The federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the relevant time. *Strickland,* 466 U.S. at 689; *Neal v. Puckett,* 286 F.3d 230, 236–37 (5th Cir. 2002). "A court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell v. Cone,* 535 U.S. 685, 701 (2002) (citing *Strickland,* 466 U.S. at 689). Federal habeas courts presume that trial strategy is objectively reasonable unless it is clearly proven

15

otherwise. *Strickland,* 466 U.S. at 689.

The second *Strickland* prong looks to prejudice caused by counsel's deficient performance. This requires "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *United States v. Mullins,* 315 F.3d 449, 456 (5th Cir. 2002) (quoting *Strickland,* 466 U.S. at 687); *Harrington v. Richter,* 131 S. Ct. 770, 791 (2001). "This burden generally is met by showing that the outcome of the proceeding would have been different but for counsel's errors." *Id.* A defendant must satisfy both *Strickland* prongs to succeed on an ineffective-assistance claim. *See Strickland,* 466 U.S. at 697. If it is possible to dispose of an ineffective-assistance-of-counsel claim without addressing both prongs, "that course should be followed." *Id.*

The *Strickland* standard applies to challenges to guilty pleas based on ineffective assistance of counsel. *Hill v. Lockhart,* 474 U.S. 52, 58 (1985). The prejudice prong requires the defendant to show "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *United States v. Glinsey,* 209 F.3d 386, 392 (5th Cir. 2000) (quoting *Lockhart,* 474 U.S. at 59).

### C. The Alleged Failure to Challenge Restitution (Ground Two)

The record undermines Gordon's allegation that Knowles failed to object to the "actual loss" amount at the sentencing hearing. Gordon's allegations are conclusory.

The record shows that Knowles did object to the relevant conduct set out in the PSR, including the $1,656,810 fraud loss attributed to Gordon and included in the restitution amount. Knowles objected that Gordon should not be held accountable for the Kaim Street properties (#49 and #50), and the Arrowwood Trail property, and that the total loss should be $959,725, a reduction

of $697,085. The record shows that Knowles did object to the actual-loss and restitution amount. The record shows no basis to infer either deficient performance or prejudice on this basis. The motion to dismiss is granted with prejudice and without leave to amend because amendment would be futile.

D.     **The Allegedly Involuntary Plea (Ground Three)**

In Gordon's plea agreement, he agreed to waive his rights to directly appeal his sentence under 18 U.S.C. § 3742(a), as well as his right to collaterally attack the judgment of conviction and sentence under 28 U.S.C. § 2255. (Docket Entry No. 123, ¶ 10). An informed and voluntary waiver is enforceable. *United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir. 1994).

The Rule 11(c)(1)(B) written plea stated that Gordon would plead guilty to Counts One and Two of the superseding indictment and the government would agree not to oppose Gordon's request for a two-level downward adjustment for acceptance of responsibility, and, if he qualified, for an additional one-level adjustment based on timely pleading. The government also agreed to consider a § 5K1.1 motion at sentencing depending on the assistance Gordon provided. The government did each of these steps. (Docket Entry No. 123, ¶ 13).

The waiver provision in the plea agreement stated:

> 10. Defendant is aware that Title 18, U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. The defendant agrees to waive the right to appeal the sentence imposed or the manner in which it was determined. The defendant may appeal *only* a sentence imposed above the statutory. **Additionally, the defendant is aware that Title 28, U.S.C. § 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the conviction or sentence has become final. The defendant waives the right to contest his conviction or sentence by means of any post-conviction proceeding.**

(*Id.*, ¶ 10 (emphasis added)). The plea agreement continued:

17

> 12. The defendant understands and agrees that each and all waivers contained in the Agreement are made in exchange for the concessions made by the United States in this plea agreement. If the defendant instructs his attorney to file a notice of appeal at the time sentence is imposed or at any time thereafter, the United States will seek specific performance of these provisions.

(*Id.*, ¶ 12). Gordon signed the following paragraph in the plea agreement:

### PLEA AGREEMENT - ADDENDUM

> I have consulted with my attorney and fully understand all my rights with respect to the indictment pending against me. My attorney has fully explained and I understand all my rights with respect to the provisions of the United States Sentencing Commission's Guidelines Manual which may apply in my case. I have read and carefully reviewed every prat of this plea agreement with my attorney. I understand this agreement and I voluntarily agree to its terms.

(*Id.*, p. 19).

At the January 10, 2012 rearraignment, the court had Gordon placed under oath, determined that he was fully competent to enter a knowing, voluntary, and informed plea, and explained the rights he would be giving up by pleading guilty. Gordon acknowledged that he understood these rights. (Docket Entry No. 512, pp. 6-15). The court explained the elements of the charges and the highest potential sentence, fine, and restitution obligations. Gordon stated that he understood. (*Id.*, pp. 15-19). He stated that he and his lawyer had carefully reviewed the plea agreement and had gone over it "page by page and line by line and even word by word." (*Id.*, p. 19). He had no additional questions to ask his lawyer. (*Id.*). The court reviewed the plea-agreement provisions in which Gordon gave up his right to appeal or collaterally challenge any sentence within the statutory range. Gordon again said that he understood. (*Id.*, pp. 21-22). Gordon also stated that he understood "the bottom line," that "in practical terms, [he] really [had] no way to challenge the sentence as long as it was within the statutory maximum." (*Id.*, p. 22). Gordon acknowledged that everything in the

factual basis about him was true and correct. He had no changes or corrections he wanted to make. (*Id.*, pp. 27-28). He acknowledged that he was making his plea freely and voluntarily and that no one had made him promises to get him to plead guilty. (*Id.*).

The court found that Gordon was mentally competent and capable of entering an informed plea; that the plea was supported by independent facts and established all the elements of the offense; that the plea was voluntarily, freely, and knowingly made; and that Gordon understood the nature of the proceedings and the consequences of his guilty plea. (*Id.*, p. 31). The court accepted the plea and found him guilty as charged in Counts One and Two in the superseding indictment. (*Id.*).

Gordon's sworn statements in open court are entitled to a strong presumption of truthfulness. *United States v. Lampaziane*, 251 F.3d 519, 524, (5th Cir. 2001) (citing *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)). The Fifth Circuit gives "great weight to the defendant's statements at the plea colloquy." *United States v. Cothran*, 302 F.3d 279, 283-84 (5th Cir. 2002). Gordon's conclusory allegations preclude the relief he seeks and this record shows that any amendment would be futile.

The government is entitled to enforce the plea agreement. The motion to dismiss the § 2255 motion and to enforce the plea agreement is granted.

## IV.  Conclusion

Because Gordon's allegations are conclusory and there is neither a factual nor legal basis for his ineffective-assistance allegations, the claims fail as a matter of law and are dismissed. The dismissal is with prejudice because the record shows that amendment would be futile.

A certificate of appealability is required before Gordon may appeal. *See Hallmark v. Johnson,* 118 F.3d 1073, 1076 (5th Cir.) (§ 2254 and § 2255 require a certificate of appealability), *cert. denied sub nom. Monroe v. Johnson,* 522 U.S. 1003 (1997). "This is a jurisdictional

prerequisite because the COA statute mandates that '[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals . . . .'" *Miller–El v. Cockrell,* 537 U.S. 322, 336 (2003) (citing 28 U.S.C. § 2253(c)(1)).

A certificate of appealability will not issue unless the defendant makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). This requires the defendant to demonstrate "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Tennard v. Dretke,* 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)). The defendant must show "that reasonable jurists could debate whether (or, for that matter, agree that) the [§ 2255 Motion] should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller–El,* 537 U.S. at 336.

A district court may deny a certificate of appealability on its own, without requiring further briefing or argument. *See Alexander v. Johnson,* 211 F.3d 895, 898 (5th Cir. 2000). After carefully considering the record, the court concludes that jurists of reason would conclude without debate that Gordon has not stated a valid claim for relief under § 2255. A certificate of appealability will not issue.

Gordon is not entitled to relief under 28 U.S.C. § 2255. His pending § 2255 motion is denied, (Docket Entry No. 500 in 11-cr-165), and the government's motion to dismiss (Docket Entry No. 521 in 11-cr-1650) is granted. No certificate of appealability will issue. The civil action is dismissed.

SIGNED on August 8, 2016, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge